J-A11002-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| JEFFREY J. KUNCELMAN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| REGINA S. KUNCELMAN | : | |
| | : | |
| Appellant | : | No. 1409 WDA 2022 |

Appeal from the Order Entered November 21, 2022
In the Court of Common Pleas of Cambria County
Civil Division at No:  No. 2020-1938

BEFORE:   BENDER, P.J.E., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY STABILE, J.:                **FILED: July 27, 2023**

Regina S. Kuncelman ("Mother") appeals from the November 21, 2022 custody order denying her request to relocate with the parties' three-year-old daughter, M.J.K., to James Island, South Carolina, and granting, in part, the petition filed by Jeffrey J. Kuncelman ("Father") for modification of the existing custody order.  We affirm.

In its opinion accompanying the subject order, the trial court set forth the procedural history and forty-eight factual findings in this case.  **See** Trial Court Opinion, 11/21/22, at 1-26.  Because the parties are well-acquainted with the history of this case, and the evidence in the certified record supports the court's findings, we adopt them herein.  **See id.**

_____

[*] Retired Senior Judge assigned to the Superior Court.

By way of background, M.J.K. was nearly four months old when the parties separated on November 2, 2019, after sixteen months of marriage. *See* N.T., 7/11/22, at 5. Mother left the marital home in Ebensburg, Cambria County, with M.J.K. and immediately moved into her parents' 120-acre farm in Hastings, Cambria County. *See id.* at 49. Father also left the marital home and returned to his seven-acre farm in Ebensburg.[1]

On May 18, 2020, Father initiated the underlying custody action. Following *interim* orders awarding Mother primary physical custody and Father partial physical custody, by final order dated November 2, 2021, the court awarded the parties shared legal custody, Mother primary physical custody, and Father partial physical custody on alternating weekends as well as every Thursday from 7:00 a.m. to 4:00 p.m. ("existing custody order").

On September 24, 2021, Mother, a nurse practitioner, filed a petition requesting to relocate with M.J.K. to Lake County, Florida, for an employment opportunity. Father timely filed a counter-affidavit objecting to the relocation on October 8, 2021. On January 3, 2022, Father filed a petition for modification of the existing custody order wherein he sought an unspecified increase in his physical custody award.

---

[1] Father testified that he owns seven acres of land and is responsible for maintaining an additional 217 acres which he plans to purchase in the future. *See* N.T., 9/8/22, at 42. Although he owned this property during his marriage, Father testified that he and Mother resided in a different home in Ebensburg, and it is unclear if Father and Mother purchased that home. *Id.* at 4.

The court scheduled the evidentiary hearing on both petitions for February 28, 2022. However, on February 23, 2022, Mother filed an emergency motion requesting temporary sole physical custody of M.J.K. pending a criminal investigation into an incident that occurred between Father and Ronald Paronish ("Maternal Grandfather") on February 21, 2022. Father testified extensively about this incident during the subject proceeding, and the court found his recitation "extremely credible." **See** Trial Court Opinion, 11/21/22, at 13-18 (citing N.T., 9/8/22, at 57-65); **see also id.** at 19.

In sum, Father testified that, as he was driving in his truck off his property to meet Mother and M.J.K. in Pittsburgh for M.J.K.'s medical appointment, he picked up a hitchhiker dressed in camouflage, wearing a hood, and appearing with an injured left leg. **See id.** at 13-14. When the man entered the passenger front seat, Father testified that he immediately recognized the individual as Maternal Grandfather. **Id.** at 14. In addition, Father also observed that Maternal Grandfather "had a can and a rag, a black rag" and

> he immediately put the rag over my face, had me pressed up against my driver's side window, and I took one kind of deep breath and my world just started going voosh, voosh, voosh [sic], and I went, hold your breath, hold your breath. And I just . . . had no strength. He was up over the center console and was on top of me.

**Id.** Father testified to the manner in which he was able to get Maternal Grandfather "off my face for a second," and retrieve his gun out of his truck's center console. **Id.** at 15. Father explained, "I just started shooting across

- 3 -

from my stomach like this and because it was blocking, my whole hand — bottom of my hand was covered in blood. Here it was my blood because it was all powder burns. I was within an inch away from shooting myself." *Id.* Father explained that he was then able to get out of his truck, "and I tried to run. . . . I could only run about less than 50 yards . . . and I almost collapsed. . . . I couldn't breathe." *Id.* at 15-16. Father testified that, because of the poisoning, "I couldn't get a breath. I couldn't get air in." *Id.* at 16. Father explained that he then

> heard tires burning out. And I turn and I looked over my shoulder and my truck had already been turned around in the road completely, 180, and was barreling across the bridges. I only had enough time — there was a 3-foot bank on each side of the road, so I dove up onto the bank behind a tree, so that he missed me with the truck.

*Id.* at 16.

Father testified that he "qualified for victim services" and receives treatment for having "a lot of fear. It's a lot of horrible dreams. . . . [Y]ou just have nights where, like, you can't get it out of your head." N.T., 9/8/22, at 69-70. Maternal Grandfather survived the incident, but the record does not indicate the extent of his injuries.

When Mother filed the aforementioned emergency motion, the investigation into the incident was pending. By agreed-upon *interim* order dated February 28, 2022, Father's partial physical custody award was restricted to supervised physical custody. The same *interim* order directed that neither Maternal Grandfather nor his wife, Joyce Paronish ("Maternal

- 4 -

Grandmother"), shall have any contact with M.J.K. pending further order. As a result, on March 1, 2022, Mother, along with M.J.K., moved out of her parents' farm into the home of her paternal cousin in Cambria County. **See** N.T., 7/11/22, at 5, 49. Further, the trial court continued the evidentiary hearing on the parties' substantive petitions "until the police complete their investigation of" the incident. Trial Court Opinion, 11/21/22, at 3 (citation omitted).

Upon praecipe by Mother, the court scheduled the custody hearing for July 11 and 26, 2022. Shortly prior to the commencement of the hearing, the District Attorney's Office advised Father that no criminal charges relating to the incident would be filed against him. **See** N.T., 7/11/22, at 4. By letter dated July 15, 2022, the District Attorney's Office confirmed that it would not initiate criminal proceedings against Father. **See** Trial Court Opinion, 11/21/22, at 18 (citation omitted). On July 15, 2022, the court vacated the supervised partial physical custody award and reinstated the existing custody order.

At the commencement of the hearing, Mother's alleged employment opportunity in Florida was no longer viable. However, she requested to relocate with M.J.K. to James Island, South Carolina, approximately five miles from Charleston, South Carolina, where she had a pending job offer. **See** N.T., 7/11/22, at 8, 48. Specifically, Mother testified that she was offered a nurse practitioner position in the pulmonary department at a Veterans

Administration hospital. *See id.* at 46-47; *see also* N.T., 7/26/22, at 37. Following two days of testimony in July of 2022, the court scheduled the hearing to continue on September 8 and October 6, 2022.[2] Prior to the completion of the four-day hearing, criminal charges relating to the incident were filed against Maternal Grandfather and subsequently bound over for court following a preliminary hearing.[3] *See* Trial Court Opinion, 11/21/22, at 19 (citing Father's Exhibit 11).

By order and opinion dated November 18, 2022, and entered on November 21, 2022, the trial court denied Mother's relocation request, granted Father's counter-affidavit regarding relocation, and granted, in part, Father's petition for modification of the existing custody order. Specifically, the court awarded the parties shared legal and physical custody on a 2-2-3 basis.[4] In addition, the court directed that Maternal Grandfather shall have

---

[2] The trial court received testimony from the following witnesses during the four-day hearing: Mother; Maternal Grandmother; Jessica Miller, the family resource specialist at Justice Works who supervised Father's visits with M.J.K. after the above-described incident; Father; Steven Kuncelman, M.J.K.'s paternal uncle; and Joseph and Janice Kuncelman, M.J.K.'s paternal grandfather and grandmother.

[3] Maternal Grandfather was charged with aggravated assault, a felony of the first degree; six misdemeanor charges of both the second and third degree; and one summary offense charge. *See* Trial Court Opinion, 11/21/22, at 19 (citing Father's Exhibit 11).

[4] The order directed that the new custody schedule commence on Monday, December 5, 2022, with Mother having custody at 5:00 p.m. until Wednesday at 5:00 p.m. Father shall have custody every week from Wednesday at 5:00
*(Footnote Continued Next Page)*

no contact with M.J.K. until further order, and that Maternal Grandmother may have supervised contact by mutual agreement.

Mother timely appealed and filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed a Rule 1925(a) opinion on December 30, 2022.

On appeal, Mother presents the following issues for our review:

I.     Did the trial court abuse its discretion and commit an error of law by misapplying the child custody and relocation laws, reaching a manifestly unreasonable result that is not supported by competent evidence?

II.    Did the trial court abuse its discretion and commit an error of law by denying Mother's request to relocate with the minor child and in its application of the relocation factors?

III.   Did the trial court abuse its discretion and commit an error of law when it failed to consider all the evidence and contradictory testimony?

IV.    Did the trial court abuse its discretion and commit an error of law by failing to consider and establish a substitute custody schedule that will adequately foster an ongoing relationship between the minor child and Father?

V.     Did the trial court abuse its discretion in failing to schedule an expedited hearing to address Mother's [n]otice and [p]etition for [r]elocation under 23 Pa.C.S. § 5337(g)?

VI.    Did the trial court err in addressing Maternal Grandparents' contact with the minor child, as it did not have jurisdiction over them as non-parties to the custody case?

Mother's Brief at 4-5.

_____

p.m. until Friday at 5:00 p.m. The parties shall alternate weekends of custody from Friday at 5:00 p.m. until Monday at 5:00 p.m.

We review Mother's issues according to the following scope and standard of review:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

**R.M.G., Jr. v. F.M.G.**, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting **Bovard v. Baker**, 775 A.2d 835, 838 (Pa. Super. 2001)). Moreover,

> [O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.
>
> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

**R.M.G., Jr., supra** at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. **Ketterer v. Seifert**, 902 A.2d 533, 539 (Pa. Super. 2006).

**A.V. v. S.T.**, 87 A.3d 818, 820 (Pa. Super. 2014).

We have explained, "It is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether,

'based on the evidence presented, given [sic] due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion. . . ." *King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005) (quoting *Hanson v. Hanson*, 878 A.2d 127, 129 (Pa. Super. 2005)). This Court has recognized that "the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record." *Ketterer*, 902 A.2d at 540 (quoting *Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

With respect to custody cases, the primary concern is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006) (citing *Arnold v. Arnold*, 847 A.2d 674, 677 (Pa. Super. 2004)).

Child custody actions are governed by the Child Custody Act ("Act"), 23 Pa.C.S. §§ 5321-5340. As the party proposing relocation, Mother had the burden of proving that relocation will serve M.J.K.'s best interests as set forth under Section 5337(h), which provides as follows.

> **(h) Relocation factors.--**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:
>
> (1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and

with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h).

Pending before the trial court in this case was also Father's request for modification of the existing custody order. Therefore, the court was required to consider the custody factors set forth in the Act, as follows.

**§ 5328. Factors to consider when awarding custody.**

**(a)** *Factors.* – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

This Court has explained that all of the factors listed in Section 5337(h) and Section 5328(a) are required to be considered by the trial court when entering a custody order. *A.V.*, 87 A.3d at 822 (citation omitted); *see also id*. at 823 (stating that Section 5323(d) applies to cases involving custody and relocation and "requires the trial court to set forth its mandatory assessment of the [. . .] factors prior to the deadline by which a litigant must file a notice of appeal.") (citations omitted).

Instantly, in its opinion accompanying the subject order, the trial court set forth its assessment of the ten relocation factors and the sixteen custody factors. ***See*** Trial Court Opinion, 11/21/22, at 27-42. The court weighed Section 5337(h)(1),(2), (3), (5), (7), and (9) in Father's favor, and only (6) in Mother's favor. The court found (4) and (10) inapplicable, and it weighed (8) neutrally between the parties. Similarly, the court weighed the following custody factors in Father's favor: Section 5328(a)(1), (4), (5), (8), (10)-(13). Like with the relocation factors, the court weighed only one custody factor — (14) — in Mother's favor. The court found (2.1), (6), (7), and (16) inapplicable, and it weighed (3), (9), and (15) neutrally between the parties.

The court explained the critical facts and its determinations regarding their weight as follows.

> Mother is an acute care nurse practitioner who anticipates receiving a doctorate in December 2022. She is currently employed part-time at a nearby Veterans Administration ("VA") hospital making approximately $70,000 per year. . . .
>
> Mother made a concerted effort to find alternate employment, applying for over 500 jobs. Although Mother has advanced degrees, her clinical skills are limited. This affected Mother's ability to land full-time employment in this area. Mother now requests permission to relocate with [M.J.K.] to James Island, South Carolina, to accept a full-time position that pays $147,000 per year and likely will offer opportunities for advancement. Mother credibly calls this job "a once-in-a-lifetime opportunity." The position would no doubt improve Mother's financial quality of life, which would necessarily "trickle-down" to [M.J.K.].
>
> Unfortunately, however, Mother's proposed move would irreparably change [M.J.K.]'s relationship with Father. More importantly, Mother has — at best — limited Father's custody and — at worst — thwarted his efforts to maintain an important

- 13 -

presence in [M.J.K.]'s life. So, while it is clear that Mother has a legitimate interest in improving her work situation, it is also evident that an added motive for Mother is continuing to restrict Father's custody given the significant proposed distance between the parties.

The final factor is disturbing and cannot be ignored. Mother's parents, with whom Mother lived from separation until February 2022, have extreme negative feelings toward Father. Maternal Grandfather attempted to kill Father on at least one (but probably two) occasion(s).[5] Maternal Grandparents' contact with [M.J.K.] is currently suspended, but Mother hopes they will also relocate to the James Island area to be near Mother and [M.J.K.]. Although there is no evidence that Mother participated in or had knowledge of Maternal Grandfather's plans to assault (and possibly kill) Father, the three parties nonetheless lived together for over two years in a culture that apparently cast Father as "the bad guy." This was not and is not in [M.J.K.]'s best interests.

---

[5] The other occasion occurred approximately eight months **prior to** the above-described incident. *See* N.T., 9/8/22, at 66. Father testified that, when he was inside Maternal Grandparents' home retrieving M.J.K. during a scheduled custody exchange, Maternal Grandfather, who had been outside spraying herbicide with a pump sprayer, reached through the back door of Father's truck, which he had left open, and sprayed the herbicide into his cup of coffee. Father testified that, while driving home, "I took a big swig. I went, what the heck. It tasted horrible. I rubbed my mouth like this and my whole hand and face was covered in a clear, like, oily substance. And I looked at the coffee. The whole top of it was full of that. That's when I saw all the spray patterns. I had speckles all over on my computer, all over my center console and everything." Trial Court Opinion, 11/21/22, at 12-13 (citing N.T., 9/8/22, at 66-68). Father testified that he reported the incident to the police, but they did not investigate it. *See* N.T., 10/6/22, at 63-64.

Father testified that, as a result of that occurrence, he suffered from Post-Traumatic Stress Syndrome and began carrying a gun with him. *See* N.T., 9/8/22, at 68-69. In fact, he testified that this is why he had the gun in the center console of his truck on the date of the February 21, 2022 incident. *See id.* Father explained, "[I]f I was in my house and I heard a noise, a creek or anything, my heart would drop out of me. I would go through my house, check my house, check room by room, check my vehicles before I came out in the mornings to go to work or anything like that. I put additional security cameras up." *Id.* at 69.

Mother's efforts to thwart Father's custody and Maternal Grandfather's diabolical efforts to harm him are significant factors in the custody and relocation determinations. These concerns far outweigh even the significant benefits of Mother's job offer.

Trial Court Opinion, 11/21/22, at 4-5. The record supports the court's findings, which we discuss *infra*.

In Mother's first through fourth issues, she contests the court's findings and/or the weight placed on every statutory factor. In essence, Mother argues that because she has always been M.J.K.'s primary caretaker, and the court weighed 5337(h)(6) in her favor, *i.e.*, whether the relocation will enhance the general quality of life for the party seeking the relocation, the court abused its discretion in not finding that the relocation will also enhance the general quality of life for M.J.K. under (h)(7) and in weighing neutrally (h)(8), *i.e.*, the reasons and motivation of each party for seeking or opposing the relocation. Mother's issues fail because it is within the trial court's purview to determine the facts of the case and which statutory factors are most critical. ***See A.V.***, 87 A.3d at 820; ***see also W.C.F. v. M.G.***, 115 A.3d 323, 330 (Pa. Super. 2015) (stating that trial courts are not required to give weighted consideration to a parent's prior role as primary caretaker when considering the custody and relocation factors) (citation omitted).

We address Mother's arguments concerning the factors that the court found significant. Primarily, the court found determinative Section 5337(h)(5), *i.e.*, whether there is an established pattern of conduct of either

- 15 -

party to promote or thwart the relationship of the child and the other party, which is similar to Section 5328(a)(1) and (8), *i.e.*, which party is more likely to encourage and permit contact him with the other parent and does not attempt to turn the child against the other parent. Mother asserts that the court abused its discretion in finding that these factors favored Father. Upon review, the competent evidence of record contradicts her claim.

The court found:

Mother has an established pattern of thwarting Father's relationship with [M.J.K.]. Mother unilaterally controlled and limited Father's custody. More importantly, Mother seems incapable of mustering of positive sentiment about Father to or in front of [M.J.K.]. . . . Mother has a pervasive disdain for Father . . . . Mother is mostly incapable of hiding her disdain from [M.J.K.].

The actions of Maternal Grandfather — which are disturbing and diabolical — cannot be ignored in this regard. Additionally, Maternal Grandmother made a knee-jerk threat of violence to Father in front of a police officer and the infant child. Maternal Grandparents and Mother were [M.J.K.]'s "bubble" when Mother lived with her parents, and this is the atmosphere in which [M.J.K.] was raised. Although there is no direct evidence the Mother participated in or had knowledge of Maternal Grandfather's plan to harm Father, it is logical to conclude that no one in the household was speaking lovingly — or even neutrally — about Father to or in front of [M.J.K.].

Father, on the other hand, is able to speak to [M.J.K.] fondly about "Mommy. . . ." There is no evidence that Father allows his serious and reasonable misgivings about Mother and her family to spill over in discussion with or around [M.J.K.].

Trial Court Opinion, 11/21/22, at 31-32.

Indeed, Father explained that the parties' marriage was argumentative from the beginning, and, for certain reasons, he questioned his paternity of

- 16 -

M.J.K., who was conceived early in the marriage. *See* N.T., 9/8/22, at 7-8, 13-15. Father testified that he requested performing a private paternity test, but Mother would not agree. *Id.* at 15-17. Therefore, the court issued an order for paternity testing in March of 2020, and the results were not received for four months. *Id.* at 17. During those months, M.J.K. aged from eight months to one year old, and Mother would not permit Father to see her. *Id.*

In the months preceding the paternity test order, Father testified that Mother required he visit with M.J.K. in a public library.[6] M.J.K. was then between four to eight months old, and Father described those visits as follows.

> [D]epending on [Mother]'s mood, if she was trying to . . . convince me to not go ahead with the divorce, she would sit there with [M.J.K.] and [M.J.K.] would be calm. If [Mother] was not happy that day, she would come in, hand me [M.J.K.], and then leave the library so [M.J.K.] would scream. I mean, bawl and gag to the point I thought she was going to throw up. And, of course, we were in a library during this and that was more so how the interactions went. . . .

*Id.* at 16.

Father eventually was awarded partial physical custody with pick-ups to occur at the Maternal Grandparents' farm, which he testified "were rough." *Id.* at 22. He described them as follows.

---

[6] Mother did offer visits at her parents' farm, but Father testified that he was not comfortable going there following Maternal Grandmother's threat on November 2, 2019, the date of the parties' separation. N.T., 9/8/22, at 16. Specifically, in the presence of a police officer whom Mother had called to the marital home, Maternal Grandmother stated to Father, "Tell you what, anything happens to [Mother] . . . I will shoot you and shoot your mother." Trial Court Opinion, 11/21/22, at 12 (citing Father's Exhibit 5 at 23).

Whenever I would pull in, . . . I could hear [M.J.K.] screaming in the house already. When I would go in, [Maternal Grandmother] would have either an iPad or and iPhone. She was in the corner videoing me. And while I was dealing with [M.J.K.], they would be yelling, ["]look at . . . her; she's terrified of you; she's terrified of you. And [Mother] would go, this is what you want. And she would start pointing at me, f--- you, f--- you.["] And it was just constant screaming.

I couldn't get [M.J.K.] out of [their house quickly] because I was told that none of the clothes that were bought for [M.J.K.] were bought with my child support money, so I had to bring my own jacket, gloves, shoes. I had to change [M.J.K.] there, take her with me, and the moment I would get her out of the house, if I wasn't followed out to the vehicle the whole time, [M.J.K.] would immediately calm down. . . .

*Id.* at 22. In addition, he explained, "[W]henever I would come in to pick up [M.J.K.], [Mother] would never hand [M.J.K.] to me. She would set [M.J.K.] down on the ground, step back while [M.J.K.] is screaming and crying and go, ["]go; go with him; Mommy is not doing this to you; you have to go with him.["] And [M.J.K.] would just be there screaming, reaching out for her mom." *Id.* at 24. Moreover, Father testified that only in the last three months has Mother referred to him as "Daddy" in M.J.K.'s presence. *Id.* at 25. Prior to that, Mother referred to Father only as "him." *Id.*

Father testified he was not made aware of M.J.K.'s pediatrician appointments until the court awarded him partial physical custody. *Id.* at 36. Father described an incident that occurred at the pediatrician's office when he attended his first appointment. He testified that Mother "immediately started screaming at me, ["]don't you start acting like a father now; you never came to other visits, now you're here; now you're trying to do this; he's faking all

this.["] She is screaming at the nurses and pointing at them. ["]He's not sitting in the same room with me. He doesn't even sit in the same waiting room as me.["]" *Id.* Father testified that the pediatrician "warned that if that type of behavior was going to continue, they would drop [M.J.K.] as a patient. . . ." *Id.*

> Further, Father testified on direct examination:
>
> Q. [D]uring the period of time since you've had partial custody, has there ever been a moment where [Mother] would bend a little bit to accommodate your schedule or your needs?
>
> A. To my memory, the first time happened yesterday. . . . Outside of that, I don't believe I've had any make-ups [of custody time missed].

*Id.* at 34-35.

Finally, with respect to the nearly five months that his custody was supervised at Justice Works because of the above-described incident, Father testified on cross-examination that Mother would not timely communicate regarding his supervised custody schedule. Father explained that he would request the time "a week in advance and then, it would be four to five days" until Mother responded which would make him have to "all the sudden figure out if we could make schedules work." N.T., 10/6/22, at 17. Based on this evidence, and the court's credibility findings in Father's favor, we discern no abuse of discretion by the court finding Section 5337(h)(5), Section 5328(a)(1), and (a)(8) in Father's favor and placing weighted consideration on Mother's disdain and thwarting M.J.K.'s relationship with him.

With respect to which party is more likely to attend to the daily physical, emotional, developmental, and educational needs of the child, and the impact that relocation would have on those needs, which the court found involved Section 5328(a)(10), Section 5337(h)(1), and (h)(2), Mother argues that the court abused its discretion in failing to find them in her favor. *See* Mother's Brief at 34-35. We disagree.

The court found that Mother lacked insight about how her behavior concerning Father could affect M.J.K.'s emotional needs. *See* Trial Court Opinion, 11/21/22, at 28-29. The court posed the following inquiry to Mother:

> [Father's counsel] asked you some questions about whether you were attempting to turn the child against [Father]. And your response was, I don't even talk about him. Do you understand how not talking about the other parent in your household also sends a signal to [M.J.K.] that he is not worthy or you don't like him or you can't say anything good about him?

N.T., 7/26/22, at 9-10. The court found Mother's answer nonresponsive and asked her the question three more times, but never obtained a clear answer. *See id.* at 9-13. On redirect examination, Mother testified with respect to why she felt that she could not talk about Father with M.J.K., and she ultimately testified, "I guess it's a mistake" not to talk about him. *Id.* at 14. Further, the court emphasized Mother's testimony that the relocation "won't be that big of an adjustment" for M.J.K. because the child had adjusted to no longer living at Maternal Grandparents' farm. Trial Court Opinion, 11/21/22, at 29; *see also* N.T., 7/11/22, at 55. The court found Mother's comparison

- 20 -

"somewhat naïve" and that it "neglects to consider the impact on [M.J.K.] by her physical removal from *Father*." *Id.* (emphasis in original).

In addition, with respect to M.J.K.'s emotional needs, the court found that it

> must also address the "elephant in the room," *i.e.*, the attempts by Mother's family to eliminate Father — both literally and figuratively — from [M.J.K.]'s life. Although there is no evidence that Mother had advance knowledge of or involvement in Maternal Grandfather's attacks on Father, it is clear that Mother and her family have a unified disdain for him. Mother's relocation is a legal way to largely eliminate Father from Child's life, which appears to be the ultimate goal. This is not in M.J.K.'s best interests and it could have a significant effect on her emotional development.

*Id.* at 29-30.

Based on the history of this case up to and including the commencement of the custody hearing, we cannot conclude that the court abused its discretion with respect to Mother's ultimate goal in the proposed relocation. Further, Mother testified that the proposed relocation would benefit M.J.K. so that she does not find out about the above-described incident between Maternal Grandfather and Father. She explained, "if we stay in this area, [M.J.K.] is going to find out about it. . . . [O]ne of the ladies at work, her son is friends with [Father] and she was telling everyone [Father]'s side of the story. . . ." N.T., 7/11/22, at 94; *see also* Trial Court Opinion, 11/21/22, at 33 (the trial court agreed that M.J.K. will learn about the criminal charges against Maternal Grandfather, "but the [c]ourt is hard-pressed to consider such circular logic to support the proposed relocation."). In addition, it is important to note that

Maternal Grandmother testified she and Maternal Grandfather plan to follow Mother to South Carolina and already submitted a housing application at a retirement community, which, as best we can discern, she testified is five or six miles away from where Mother proposed to live in James Island. N.T., 7/26/22, at 76-77, 94. Maternal Grandmother also stated that if Mother "needs help and she wants us to move in with her the first two or three months to help her out, that's fine with me." *Id.* at 94. We conclude that this testimonial evidence supports the court's decision against weighing those statutory factors implicating the child's emotional needs in favor of Mother.

With respect Section 5337(h)(9) and Section 5328(a)(2), *i.e.*, the present and past abuse committed by a party or member of the party's household, and whether there is continued risk of harm to the child or an abused party, the court found that there was no evidence of abuse by either parent. However, the court "strongly considered the physical attacks by Maternal Grandfather on Father" and found that these factors do not favor relocation or Mother's primary physical custody. *See* Trial Court Opinion, 11/21/22, at 34, 36.

Despite the foregoing evidence, Mother contends that the court abused its discretion because neither she nor any members of her household, "have abused the minor child **or Father**." Mother's Brief at 30 (emphasis added). Based on competent evidence supporting the court's finding that Maternal Grandfather assaulted Father on more than one occasion, Mother's argument

fails. In the alternative, Mother contends that the court abused its discretion because she no longer lives with Maternal Grandparents, and they will not live with her if she is permitted to relocate to South Carolina. She also contends there is no evidence the actions alleged against Maternal Grandfather "would place the minor child at a continued risk of harm." *Id.* at 32. We discern no abuse of discretion by the weighted consideration the court gave to Maternal Grandfather's assault against Father on at least one occasion while Mother lived in his household with respect to Section 5337(h)(9) and Section 5328(a)(2). *See* N.T., 10/6/22, at 58 (Father testified that he has "a healthy fear of [Mother's] whole family.").

Lastly, Mother argues that the court abused its discretion pursuant to Section 5337(h)(3), *i.e.*, the feasibility of preserving the relationship between Father's relationship with M.J.K. through suitable custody arrangements. Specifically, Mother asserts that the court failed to consider her proposed custody schedule that would provide Father more custody if she relocated with M.J.K. to South Carolina than under the existing custody order. *See* Mother's Brief at 49. However, the court revealed that it did consider her proposed custody schedule and reasoned, "Father's *current* custody schedule (alternating weekends and Thursdays) could possibly be replicated *numerically* by awarding Father custody on all school breaks and major holidays, but relocation would no doubt change the *nature* of [M.J.K.]'s relationship with Father." Trial Court Opinion, 11/21/22, at 30 (emphasis in

original). The court concluded that M.J.K.'s relationship with Father "will be irreparably changed, and not for the better" if Mother's relocation request is granted and concluded that this "outweighs the financial and social benefits of the proposed relocation." *Id.* at 33. Because the trial court's factual findings are supported by competent evidence in the record, and the court's conclusions are reasonable in light of those findings, we discern no abuse of discretion pursuant to 23 Pa.C.S. §§ 5337(h) and 5328(a). Mother's first through fourth issues on appeal fail.

In her fifth issue, Mother argues that the court of abused its discretion by failing to schedule an expedited hearing on her proposed relocation petition pursuant to 23 Pa.C.S. § 5337(g), which provides, in pertinent part:

> **(g) *Hearing.***
>
> **(1)** except as set forth in paragraph (3), the court shall hold an expedited full hearing on the proposed relocation after a timely objection has been filed and before the relocation occurs.
>
> . . .

23 Pa.C.S. § 5337(g). Specifically, Mother argues that the trial was scheduled for February 28, 2022, which was five months after Father timely filed the counter-affidavit objecting to the proposed relocation, and that this "was anything but 'expedited.'" Mother's Brief at 52.

In its Rule 1925(a) opinion, the trial court states that Mother did not object to the February 28, 2022 scheduled date for the hearing, and Mother

does not assert that she lodged any objection.[7]  **See** Trial Court Opinion, 12/30/22, at 2 n.1.  Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.  **See** Pa.R.A.P. 302(a).  This Court has explained:

> On appeal, we will not consider assignments of error that were not brought to the tribunal's attention at a time at which the error could have been corrected or the alleged prejudice could have been mitigated.  **Tindall v. Friedman**, 970 A.2d 1159, 1174 (Pa. Super. 2009).  "In this jurisdiction one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter."  **Id.** (quoting **Thompson v. Thompson**, 963 A.2d 474, 475-46 (Pa. Super. 2008) (citation omitted)).

**State Farm Mutual v. Dill**, 108 A.3d 882, 885 (Pa. Super. 2015) (*en banc*).  Thus, Mother's claim is waived.  In addition, Mother asserts that the court did not render a prompt decision after the conclusion of the trial pursuant to Pa.R.C.P. 1915.4 (Prompt Disposition of Custody Cases).  Mother failed to include this alleged error in her Rule 1925(b) statement or in the statement of questions involved in her brief.  Therefore, this claim is also waived.  **See In re M.Z.T.M.W.**, 163 A.3d 462, 466 (Pa. Super. 2017)(reiterating that issues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived).

---

[7] Mother does not argue that the court violated the same provision with respect to any of the subsequent continuances of the custody trial.  Indeed, the trial court states that Mother agreed to each and every continuance.  **See** Trial Court Opinion, 12/30/22, at 2 n.1.

In her sixth and final issue, Mother argues that the trial court erred in restricting and/or limiting Maternal Grandparents' contact with M.J.K. in the custody order because they are not parties to the action, and the court did not have personal jurisdiction over them. *See* Mother's Brief at 55-56 (citing *Belliveau v. Phillips*, 207 A.3d 391, 395 (Pa. Super. 2019) (holding that a court "must have personal jurisdiction over a party to enter a judgment against that party")). We discern no error or abuse of discretion.

The order provides, in pertinent part:

**6. <u>CONTACT WITH MATERNAL GRANDPARENTS</u>.**

a. [Maternal Grandfather] shall have no contact with the child until further order.

b. [Maternal Grandmother] may have supervised contact with the child by mutual agreement. Justice Works shall provide supervision unless otherwise agreed. Maternal Grandmother shall pay all costs of supervision.

Order, 11/21/22, at ¶ 6.

Mother's claim fails to the extent that the relevant provisions of the custody are directives to Mother and Father in exercising their respective custody of M.J.K., and not to Maternal Grandparents. The court explained in its Rule 1925(a) opinion that

[M.J.K.] is at risk of emotional harm from Maternal Grandparents. And Father is at risk of physical harm from Maternal Grandparents. The [t]rial [c]ourt determined that Maternal Grandfather attempted to **kill** Father. And Maternal Grandmother made threats against both Father and his mother, the paternal grandmother. J-A1100 The [s]ubject [o]rder permits *Mother and Father* to facilitate Maternal Grandmother's supervised contact with the minor child by mutual agreement. The [s]ubject [o]rder

- 26 -

establishes Justice Works as a default supervisor unless Mother and Father agree otherwise. The [t]rial [c]ourt acknowledges that the [s]ubject [o]rder obligates Maternal Grandmother to pay the costs of her supervised visitation, but the intent was that neither Mother nor Father shall be responsible *to the other* for those costs. Again, these restrictions apply to the conduct of Mother and Father as a means to protect [M.J.K.]. . . .

Trial Court Opinion, 12/30/22, at 3 (citations omitted) (emphasis in original).

We agree with the court that the relevant provisions further M.J.K.'s best interests and mandate Mother and Father to abide by the parameters set by court for the child's relationship with the Maternal Grandparents. Mother's final claim fails. Accordingly, we affirm the custody order denying Mother's relocation request and awarding the parties shared physical custody.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/27/2023